UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

FRIENDS OF MILWAUKEE'S RIVERS AND
LAKE MICHIGAN FEDERATION,

        Plaintiffs,

        v.                                            Case No. 02-C-0270

MILWAUKEE METROPOLITAN
SEWERAGE DISTRICT,

        Defendant.

DECISION AND ORDER
DISMISSING CASE AS BARRED BY THE DOCTRINE OF RES JUDICATA

On September 29, 2003, this court granted defendant's motion to dismiss and ruled that the lawsuit was barred because Wisconsin had taken judicial and administrative enforcement actions to diligently prosecute its violation of the Clean Water Act (CWA). Alternatively, the court found the suit was barred by the doctrine of *res judicata*. The Seventh Circuit Court of Appeals remanded, asking this court to consider whether the 2002 Stipulation settling the State of Wisconsin's action against the Milwaukee Metropolitan Sewerage District (MMSD) regarding sanitary sewer over flows (SSOs) was "calculated in good faith to bring about compliance with the Act." Specifically, the Seventh Circuit wrote:

> Because we cannot state with certainty on the basis of this record whether the 2002 Stipulation is calculated to result in compliance with the Act, we therefore remand for a determination of that issue. Specifically, the district court should determine whether the systemic inadequacies of MMSD's sewerage facilities will be sufficiently ameliorated by the proposed remedial projects to result in compliance. If the district court concludes, after giving some deference to the judgment of the State, that there is a realistic prospect that violations due to the same underlying

> causes purportedly addressed by the 2002 Stipulation will continue after the planned improvements are completed, the plaintiffs' suit may proceed. If, after a more detailed examination of the 2002 Stipulation, the district court concludes that no such prospect exists, it may so find, provide a thorough explanation of its conclusion and consider reinvocation of the *res judicata* bar. However, before reimposing a *res judicata* bar, the district court should determine whether Wisconsin's fairness exception to the *res judicata* doctrine should be applied here.

*Friends of the Milwaukee Rivers v. MMSD*, 382 F.3d 743, 760 (7th Cir. 2004). Accordingly, the court conducted an evidentiary hearing on August 25-26, 2005, and ordered post hearing briefing. Plaintiffs have since filed motions to supplement the record with evidence of overflows on March 13 and April 3, 2006, and a November 14, 2005, letter from MMSD's Executive Director to the Wisconsin Department of Natural Resources.

Having considered the testimony and evidence in this record, this court continues to believe that this suit is barred by the doctrine of *res judicata*. The evidence shows that, at the time that the 2002 Stipulation was drafted, all parties involved in the negotiations intended the 2002 Stipulation to ameliorate the systemic inadequacies of MMSD's sewerage facilities. Moreover, the 2002 Stipulation was calculated to result in compliance with MMSD's permit and the CWA. Consequently, the court is satisfied that the Wisconsin Department of Natural Resources (WDNR) was in privity with the plaintiffs when it entered the 2002 Stipulation.

The court is not persuaded, for purposes of applying the doctrine of *res judicata*, that privity may be reexamined every three to five years. In making their argument, plaintiffs ask this court to reconsider this issue based on subsequent events. They cite articles printed in the Milwaukee Journal Sentinel about heavy rainfall in 2004 and corresponding overflows, as well as two events in 2006. These events occurred after this court granted defendant's

motion to dismiss, after the record was transmitted to the Seventh Circuit, and after the WDNR issued a new permit. Revisiting this issue years later derogates the principles of finality underlying the doctrine of res judicata.

Moreover, the WDNR acted reasonably in 2002 based on the technical information available at the time. Further, any decision by this court based on subsequent overflows would have to ignore the time lines for completing the improvements required by the 2002 Stipulation. As acknowledged by the Seventh Circuit, "the State was unquestionably aware that violations would continue while the projects mandated by the 2002 Stipulation are being implemented." *Friends of Milwaukee's Rivers,* 382 F.3d at 758. Ultimately, whether the 2002 Stipulation is calculated in good faith to require compliance with the CWA requires consideration of the 2002 Stipulation and the information and data available to the parties at the time of their stipulation rather than the 20/20 vision of hindsight. *Id.*, at 759 ("[D]iligence does not require a state agency to have perfect foresight.")

On remand, this court was instructed to further consider whether *res judicata* bars this action. In Wisconsin, *res judicata* has three elements: (1) identity between the parties or their privies in the prior and present suits; (2) prior litigation that resulted in a final judgment on the merits by a court with jurisdiction; and (3) identity of the causes of action in the two suits. *Kruckenberg v. Harvey*, 279 Wis. 2d 520, 531 (2005). The Wisconsin Supreme Court has departed from stare decisis and disavowed any language in the decisions of the court of appeals requiring a court to conduct a "fundamental fairness" hearing in applying the doctrine of *res judicata*, or allowing litigation of an otherwise barred claim to continue simply because in the particular case, application of the doctrine of claim preclusion might appear unfair. *Id.*, 279 Wis. 2d at 549.

3

The Wisconsin Supreme Court described the policies underlying the doctrine of res judicata as follows:

> Claim preclusion thus provides an effective and useful means to establish and fix the rights of individuals, to relive parties of the cost and vexation of multiple lawsuits, to conserve judicial resources, to prevent inconsistent decisions, and to encourage reliance on adjudication. The doctrine of claim preclusion recognizes that 'endless litigation leads to chaos; that certainty in legal relations must be maintained; that after a party has had his day in court, justice, expedience, and the preservation of the public tranquillity requires that the matter be at an end.'

*Id.*, 279 Wis. 2d at 530-531.

The Seventh Circuit agreed that the defendants satisfied the second and third elements, *i.e.,* prior ligation on the merits and identity of causes of action. Furthermore, the appeals court agreed that a person not a party to the previous action may be in privity with an "official or agency invested by law with authority to represent the person's interests." *Friends of Milwaukee's Rivers,* 382 F. 3d at 759 (citing *Restatement (Second) of Judgments* § 41(1)(d)). Additionally, the Seventh Circuit determined that "for a state agency to be in privity with the public's interests, the state's subsequently-filed government action must be a diligent prosecution." *Id.*

The diligent prosecution analysis adopted by the Seventh Circuit was a departure from its more common application insofar as it is typically aimed at barring citizen suits commenced subsequent to a state action rather than for determining whether a settlement agreement should be binding upon a timely filed and commenced citizen action. David M. Loring, Comment, *The Bar to Citizen Suits: The Preclusive Effect of a Settlement between the Government and Violator on Citizen Suits Following Friends of Milwaukee's Rivers v. Milwaukee Metropolitan Sewerage District*, 2005 Wis. L. Rev. 1345, 1368 (2005).

4

In the citizen suit context, prosecutions are presumed diligent for a number of policy considerations including deference to state and federal decision-making and enforcement authority, litigants' interest in the finality of their cases, preservation of the incentives that polluters might have to settle charges with state or federal authorities, and recognition that citizen suits are intended to supplement rather than supplant the overall enforcement regime. *Id.*, at 1355; *see also Arkansas Wildlife Federation v. ICI Americas, Inc.*, 29 F.3d 376, 380 (8th Cir. 1994); *Jones v. City of Lakeland*, 175 F.3d 410, 414 (6th Cir.1999); and, *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation*, 484 U.S. 49, 60 (1987).

Previously, this court examined diligence in granting defendant's motion to dismiss. In that decision, this court found that the 2002 Stipulation expressed the intent of the parties to present a comprehensive solution to sanitary sewer overflows, regardless of their cause, including but not limited to wet weather events, equipment malfunctions, and operator error, and that the stipulation is designed to bring MMSD into compliance with the Wisconsin Pollutant Discharge Elimination System (WPDES) permit. However, the Seventh Circuit urged the court to consider whether the 2002 Stipulation is "capable of requiring compliance with the Act and is in good faith calculated to do so" and agreed with plaintiffs that the focus of the diligent prosecution inquiry should be on "whether the actions are calculated to eliminate the cause(s) of the violations." *Id.*, 382 F. 3d at 760. In particular, the Seventh Circuit expressed concern that the 2002 Stipulation will merely reduce the number and volume of overflows rather than end the violations. *Id.*, at 764.

> Under the circumstances of this case, we cannot say that simply throwing more money at the problems and taking an inordinately long time to determine if enough money was thrown at the problems to solve them this time around are actions calculated in good faith to bring about compliance with the Act. The record to

5

> date does not inspire confidence that effective and timely action will be taken to address problems of long standing. While the 2002 Stipulation will hopefully result in fewer and smaller violations after the mandated projects are completed, it is still, when all is said and done, a stalling tactic rather than a compliance strategy. As such, we cannot say that it is a diligent prosecution, and we cannot uphold the district court's determination that *res judicata* bars the plaintiffs' suit.

*Id.*, 382 F.3d at 764 - 765.

As a starting point, this court must decide what is meant by compliance. The CWA does not dictate the total elimination of overflows. Rather, it forbids the discharge of any pollutants unless authorized by a permit issued by the United States Environmental Protection Agency or an approved state permitting program. 33 U.S.C. § 1311, 1342(a), (b). Here, the MMSD must comply with a WPDES permit issued by the WDNR. At the time of the 2002 Stipulation, WPDES Permit No. WI-0036820-1, authorized up to six overflows per year from the combined sewer area (CSOs) and contained a general prohibition on sanitary sewer overflows subject to certain exceptions to enforcement (Ex. 1002, pp., 11, 33, and 51):

> (17) <u>UNSCHEDULED BYPASSING</u>. Any unscheduled diversion or bypass of wastewater at the treatment work collection system is prohibited except in the following cases:
>
> (a) An inadvertent bypass resulting from equipment damage or temporary power interruption;
> (b) An unavoidable bypass necessary to prevent loss of life or serve property damage; or
> (c) A bypass of excessive storm drainage or runoff which would damage any facilities necessary for compliance with the effluent limitations and prohibitions of the permit. In the event of an unscheduled bypass, the permittee shall immediately notify the Department district office by telephone within 24 hours after an occurrence. In addition, the permittee shall notify the Department by letter within 5 days after each such unscheduled

> diversion or unscheduled bypass. The written notification shall at a minimum include reasons for such unscheduled bypass including dates, length of bypass and steps taken or planned to correct and eliminate such occurrences.

(Ex. 1002, pp. 51-52) The WDNR issued a new permit to MMSD in 2003, which is similar to the 1998 permit. That permit is still in effect today. (Ex. 1006)[1] The permit acknowledges that there will be unavoidable circumstances, and that overflows are controlled by physical infrastructure sized to capture a certain amount of flow to the system. Regardless of the court's views on the acceptability of overflows, it cannot hold the defendant to a higher standard than that imposed by the CWA and WPDES.

In addition, the WDNR controls the size of the physical infrastructure. (8/24/05 Tr., p. 24) The WDNR approves systems, plants or extensions thereof. Wis. Stat. § 281.41. The approval process requires submission of a complete facility plan, including an analysis of the cost of alternatives in the plan. Wis. Adm. Code NR § 110.08. Further, Chapter NR 110 requires that "sewers be designed to carry, when running full, the peak design flows expected from domestic, commercial, industrial and other sources, and infiltration and inflow." "Peak design flow" must be established by using existing sewage flow or water use records, and records of infiltration and inflow. Wis. Adm. Code NR § 110.13. However, the Wisconsin Administrative Code does not dictate the method to be used in estimating peak design flow. (Ex. 6, p. 14)

---

[1] The new permit contains slightly different wording for the exception to the prohibition on SSOs but still exempts overflows that are "unavoidable to prevent loss of life, personal injury, or severe property damage." (Ex. 1006, pp. 70-71) It also continues to authorize six CSO events per year. (Ex. 1006, p. 7). Charles G. Burney, Special Assistant in the Bureau of Watershed Management, WDNR, testified that the exceptions are similar in the 2003 and 1997 permits. (8/24/05 Hearing Tr., p. 250)

In a 2001 report entitled *Sewer Overflows in Wisconsin - A Report to the Natural Resources Board*, the WDNR described the problems in calculating the peak design flow:

> The design requirements in chapter NR 110 do not specify the exact method by which the maximum (or peak) design flow is to be estimated. The chapter requires that sewage flow estimates include residential, commercial, industrial and institutional flows and 'non-excessive' infiltration and inflow. The 'performance standard' that is implied in the federal Clean Water Act is that overflows from the sewer system and bypasses at the treatment plant should not occur except under exceptional circumstances.
>
> The design engineer develops an estimate of a 'peak' flow condition in order to evaluate I/I removal or size sewerage facilities. Many different methods have been used to estimate the peak flow rate. The choice of method may be based partly on the availability and quality of data. For example, the largest measured flow over some past period might be used. If older data are believed to be inaccurate the largest measured flow in the last 3 or 5 years may be chosen as the peak flow.
>
> If enough data is available to make a good correlation between flow and rainfall, then the peak flow may be extrapolated to a "design storm condition. For example, if the largest measured flow occurred during a 1.5 inch rainfall, then the engineer may estimate, based on available data, what flow would be expected during a larger rainfall event that may equate to a 10-year frequency storm. In some instances, detailed modeling analyses may be conducted to produce a correlation between rainfall events and sewage system flows.
>
> A large margin for error exists in these analyses because of our inability to accurately account for all the variables involved. Even when sufficient data is available to allow a sophisticated analysis of infiltration and inflow, two storm events with the same measured rainfall can produce vastly different amounts of I/I depending on preceding rainfall, snow cover, frost depth and intensity and extent of the rainfall. Sewers and treatment facilities can be designed conservatively. However, there are limits to how large facilities can be built and still function effectively during average conditions. Furthermore, none of these methods can accurately depict how changes in the integrity of the sewer system, over time, will affect the amount of I/I that enters the system.

(Ex. 6, pp. 14-15) This 2001 report formed the foundation for the 2002 Stipulation.

During the time leading up to the 2002 Stipulation, defendant was implementing the 2010 Facilities Plan (2010 Plan). The 2010 Plan was formulated by the defendant using a technical advisory team of engineers from the communities within the district and the WDNR. (8/24/05 Tr., p. 22) This 2010 Plan was said to address the conveyance, storage and treatment needs of the district through 2010. (Ex. 1000) The WDNR approved the 2010 Facilities Plan on December 9, 1998, and currently defendant is preparing the same type of plan for the year 2020 as required by the 2002 Stipulation. (Ex. 1001)

For purposes of the 2010 Plan, defendant selected a storm that occurred in May 1990 as the design storm for the conveyance system analysis. (Doc. 1000, Vol. 1, Ch. 4-53) That storm resulted in the highest maximum daily flow to the South Shore ever recorded. (*Id.*) Ten years of monthly high flows from 15 continuous monitors and South Shore were ranked in determining an exceedance probability and then plotted against the exceedance probability. Then, the graph was used to identify the five-year recurrence interval flow for each monitor. (*Id.*)

MMSD developed a "very sophisticated model" looking at land use, types of land cover, population projections, water quality, flap gates, and the historical rainfall pattern to project the system's capacity. (8/24/05 Tr., pp. 21-22) It also considered a range of alternatives and made a recommendation regarding the best course of action. (Ex. 1000, Vol. 3, Chs. 12, 13; 8/24/05 Tr., p. 23)

Based on the modeling, the 2010 Plan recommended achieving the required storage by taking actions to produce a 5 percent reduction in infiltration and inflow (I/I). (Ex.

9

1000, Vol. 3, 13-1) Defendant concluded that the 5 percent reduction could be realized primarily from two sources: manhole frame/chimney interface repairs and manhole cover repairs. (Ex. 1000, Vol. 3, Ch. 8-13) Once approved, defendant set about implementing this alternative by providing funding to its satellite communities to implement Limited Sanitary Sewer Evaluation Studies to identify manholes in need of repair. (Ex. 1000, Ch. 14, pp. 1-2) The 2002 Stipulation required completion of this work by December 31, 2002. (Ex. 5, p. 5)

The 2010 Plan also recommended upgrades to the physical infrastructure, and completion of these upgrades is the first item required by the WDNR in the stipulation. (Ex. 5, p. 3) There were 25 projects in the recommended plan. Of these, 21 were reinforcement projects identified under the five-year overflow control objective at the cost-effective level of I/I removal of about 5 percent of maximum daily flow. (Ex. 1000, Vol. 3, Ch. 13-2)

Ultimately, the Stipulation, which references the WPDES permit and 2010 Plan design standard, provides the benchmark for compliance in this case. It reflects the judgment of the defendant and the WDNR that flows greater than those expected on a five-year recurrence interval are so infrequent that construction of additional infrastructure is unwarranted from a cost-benefit perspective. Indeed, Duane H. Schuettelz, Chief of the Wastewater Permits and Pretreatment section in the WDNR's Bureau of Watershed Management, testified in a deposition that the WDNR approved the five-year design storm and that the WDNR would, therefore, hold the defendant to that standard:

> [I]t would have been a bit disingenuous on our part to on the one hand approve activities to implement a five-year design storm and then say to somebody that, well, we didn't really mean it and, therefore, we are going to enforce . . . something more stringent than that.

(Ex. 1009, p. 91)

In addition, defendant's Executive Director, Kevin Shafer, testified that the 2001 Sewer Overflow Report prepared by the WDNR, led to negotiations between the defendant and the WDNR and, eventually, the 2002 Stipulation. (8/24/05 Tr., p. 37) The 2001 Report discusses sanitary sewer and combined sewer systems in Wisconsin, contains a description of the Milwaukee Metropolitan Sewage System, the legal requirements, a description of the Water Pollution Abatement Program, a discussion of the 2010 Plan, and U. S. EPA involvement. (Ex. 6, pp. 18-31) It analyzes the 13 SSOs reported since 1994 and concludes that eight of those may not have been authorized by the permit. (*Id.*, p. 38) Finally, the 2001 Report recommends actions to be taken by the defendant and the communities served by the defendant. (*Id.*) Specifically, the WDNR suggested:

> The Milwaukee Metropolitan Sewerage District must continue to improve the operation of its conveyance, storage and treatment facilities to maximize the amount of combined and sanitary sewage that is captured, stored and treated before discharge to surface waters. MMSD must also work with its contract and service communities to design and implement cost-effective ways to significantly reduce the excessive infiltration and inflow that currently enters local sewers that are tributary to the District's system. In addition, MMSD must prepare a new facilities plan for the period 2010 to 2020 that identifies projects that are needed to upgrade conveyance, storage and treatment to assure that SSOs are prevented and CSOs are minimized.

(Ex. 6, Executive Summary)

In the negotiations leading up to the 2002 Stipulation, the WDNR was adamant about the need for more storage capacity. Appendix C to the Sewer Overflow Report revealed that the largest unauthorized SSO occurred on May 17, 2000, and that the overflow was 110 million gallons. (Ex. 6, App. C) The WDNR and defendant agreed that increasing

11

the storage capacity by 116 million gallons beyond the 2010 Facilities Plan would more than capture the largest storm. (8/24/05 Tr., p. 41)

The WDNR also required the Real Time Control Project (Ex. 5, p. 4), the Capacity, Management, Operation and Maintenance (CMOM) program, the completion of the 2020 Facilities Planning project, and the private property I/I reduction programs. (8/24/05, p. 59) The CMOM program was added to the 2002 Stipulation in response to demands by the EPA. (*Id*., p. 42) Considering the information available to the parties when they negotiated the 2002 Stipulation, this court does not doubt that they were prosecuting the violations diligently and proceeding towards compliance.

At the evidentiary hearing in this matter, the defendant called Dr. James T. Smullen to testify regarding the modeling to evaluate the adequacy of the 2002 Stipulation. (8/24/05 Tr., pp. 124-180) With over thirty years of experience, Dr. Smullen manages large overflow reduction projects for Philadelphia and Pittsburgh. (*Id.*, pp. 124-127) Hydraulic modeling is "the single largest element" in all of the projects. (*Id*., p. 127) The basic process uses mathematical computer based models to simulate the relationship between rainfall and runoff, and numerical models to simulate how sewer pipes take those flows and transmit them to either treatment or storage facilities in the system. (*Id.*, p. 128)

Dr. Smullen concluded, to a reasonable degree of scientific certainty, that flows from MMSD's separate sewer area will require 383 million gallons of storage volume to prevent SSOs and meet the five-year design standard event. Hence, the 2002 Stipulation, which requires 521 million gallons of storage volume, "should be more than adequate to stop the sanitary sewer overflows that have been targeted in the system." (*Id.*, p. 130) In addition,

Dr. Smullen concluded that the infiltration and inflow decrease of 5 percent was more than met over the period after the tunnel was in place through 2004. (*Id.*)

Plaintiffs' expert, Dr. Bruce A. Bell, acknowledged that the results of Dr. Smullen's model seemed reasonable, but felt that a five-year rainfall event would have been a more appropriate design standard than the five-year wastewater event approved in the 2010 Facilities Plan. (2/25/05 Tr., pp. 310-311) Dr. Bell opined that the capacity added by the 2002 Stipulation will be insufficient to achieve compliance with the WPDES permit. (8/24/05 Tr., p. 306) Moreover, Dr. Bell felt that defendant has not demonstrated that it achieved the 5% I/I reduction mandated by paragraph 5(A) of the Stipulation.

Notably, Dr. Smullen requested modeling of the five-year rainfall event suggested by Dr. Bell of 3.14 inches of rain in a 24-hour period. (*Id.*, p. 145) This model run estimated a need for 437 million gallons of storage to prevent SSOs, which is still less than the 521 million gallons that the Stipulation makes available. (8/24/05 Tr., p. 125) Dr. Smullen's modeling and the modeling prepared for the 2010 Facilities Plan suggested that the 521 million gallons of storage would be more than adequate to prevent SSOs for the five-year design standard and smaller. Further, Dr. Smullen plotted extraneous flow and drew the trend line, revealing a reduction in excess of 5 percent between 1994 and 2004. (*Id.*, pp. 146-148)

Dr. Bell testified that he had not seen data showing enough reserve storage for combined sewage as long as storage capacity gets used for the sanitary sewage and that a human, assisted by a computer interface, must correctly decide to reserve sufficient sanitary sewage capacity for a particular storm. (8/25/05 Tr., p. 307) Briefly, the storage tunnel captures flows from combined and separated areas, and, during most rain events, captures

13

the flow from both. (Ex. 6, pp. 21-23, 38) However, during large rain events, MMSD is authorized to allow overflows from the combined sewer area. (Ex. 1002, p. 33, Ex. 1006, p. 7)

Dr. Bell's analysis does not address several key facts. First, MMSD's permit allows six CSOs per year, 22 U.S.C. § 1342(q) and 59 Fed. Reg. 18688, 18692 (CSO policy allows six CSOs per year as approved by the permitting entity), and the CSO violations are not the subject of this suit or the Stipulation at issue. Second, when the Stipulation was negotiated, the default Volume Reserved from Sanitary Sewer Inflow (VRSSI) was 200 million gallons (8/24/05 Tr., pp. 45-46) which MMSD modifies as it gathers additional information about a storm. (8/24/05 Tr., p. 46) MMSD presented evidence that the Stipulation enhances its ability to move the VRSSI up or down based on additional storage capacity and the Real Time Control system. Also, the most recent modeling shows that 383 million gallons of storage capacity were necessary to capture the five-year design standard event, and that the system will have 521 gallons of storage capacity. (8/24/05 Tr., pp. 136-137) Hence, MMSD will be able to allow 138 million gallons of combined flow and still prevent an unpermitted SSO. Further, Shafer testified that MMSD intends to move the initial VRSSI to 450 million gallons to ensure that all SSOs are captured. (8/24/05 Tr., p. 47)

In addition, the new Real Time Control System required by the Stipulation gathers information from rain gauges, sensors, and weather forecasts and uses a model, called an Artificial Neural network to call upon historical recorded data to predict flows generated by a particular event. (Ex. 40, ES-2) The prediction is updated every five minutes whereas the old computer system only updated every 24 hours. (8/25/05 Tr., p. 344)

14

Finally, the 2010 Facilities Plan assumed I/I rates based on measurements taken through 1995, and calculated that a five to 6 percent reduction in I/I would prevent the need for approximately 69 million gallons of storage. (Ex. 1000, Vol. 2, Ch. App. A, p. 2) MMSD has documented a 10 percent reduction in I/I from levels experienced in 1994-1995. (8/24/05 Tr., pp. 54-55; Ex. 1003) Also, Dr. Bell's assessment that 1998 should be the baseline ignores the 1995 baseline for the 2010 Facilities Plan and Stipulation.

The WDNR employees who testified in this matter stated that in 2002 they believe the Stipulation would result in compliance. Charles G. Burney, a Special Assistant in the Bureau of Watershed Management who participated in the negotiations that led to the 2002 Stipulation, testified:

> Q: Mr. Burney, with respect to the 2002 stipulation that was entered between the state and MMSD in Milwaukee County, at the time that the stipulation was entered into did you believe that the provisions of the stipulation when implemented would bring MMSD into compliance with the permit that was issued and in force at the time of the [stipulation]?
> A: Yeah, at the time we thought that it covered everything completely.
> Q: And did you think that the view was reasonable at the time?
> A: Yeah, I thought, I actually thought that the stipulation was more than was required for the compliance with the permit, that there were items in there that went beyond simply what would have been required to get compliance so we were pretty happy with it.
> Q: How so? How did you think it went beyond what was required?
> A: Well, the overflows that occurred up to that date, the additional storage capacity would have been sufficient to control those overflow volumes. So everything we got beyond the storage components, the CMOM components, the I/I reduction, the 2020 planning, all of that in my mind is in addition to what we would have gotten if we had just

15

> looked at compliance with the or correction of the previous
> overflows.

(Doc. # 88, Ex. D, pp. 162-163)

At the hearing, Burney again testified he thought that the 2002 Stipulation got the WDNR more than it needed for compliance. (8/24/05 Tr., p. 247) He believed the storage capacity alone was sufficient to bring MMSD into compliance by looking at the storage that was proposed to be increased and comparing it to the overflows that had occurred since the storage system had come online. Burney felt that the storage increase was sufficient to address all the violations that the WDNR had alleged in its referral to the Wisconsin Department of Justice. (*Id.*) Burney further testified that the goal of the 2002 Stipulation was elimination of unpermitted SSOs, and stated his belief that the Stipulation would accomplish that goal. (*Id.*, p. 249)

Now, Burney believes that the overflows that occurred in late May of 2004 "were beyond what would have been controlled by the projects contained in the 2002 stipulation" but that the overflows earlier in that month would have been contained. (8/24/05 Tr., pp. 205-208) He testified that the WDNR issued a Notice of Violation to MMSD as a result of the May 2004 SSO events (8/24/05 Tr., pp. 191-192; Ex. 29), and that the severity of the storms was not a sufficient reason to say that the overflow should have occurred. (Id., 226) However, Burney admitted that he did not do any mathematical modeling to determine how the system responded to the storm. (*Id.*, p. 251) He further admitted that the capacity expansions had not been built as of May 2004; that many other provisions of the Stipulation had deadlines beyond May of 2004; that he had not analyzed the amount of flow that would have been reduced by the I/I projects included in the Stipulation; that he had not analyzed the impact of

the CMOM program called for in the Stipulation; and that he had not analyzed how the inoperability of one deep tunnel pump affected flow at the time of the 2004 storm. (Id., p. 253-254)

Gerald Novotney, a Wastewater Engineer with the WDNR, testified in his deposition that when the 2002 Stipulation was entered, he believed the provisions, when implemented, would be sufficient to achieve a level of protection as intended by the WDNR. (Ex. 1008, p. 102) According to Novotney, the capacity increases "were intended to provide sufficient capacity such that the events occurring prior to the stipulation date would have been abated." (*Id.*) Moreover, the events that occurred up to the time of the 2002 stipulation were used in measuring what the system should be able to handle. (*Id.*, p. 103) Novotney was unequivocal in his testimony that, based on experience, judgment and information at the time, the 2002 Stipulation afforded the level of protection desired by the WDNR. (*Id.*, pp. 104-105)

Schuettpelz testified that it was his understanding that "full compliance with the Stipulation would, to the best of anyone's ability to make the judgment at that point in time, would meet the prohibition that's contained in the permit or was contained at the permit at that time." (Ex. 1009, p. 25) Schuettpelz further testified that Burney was the most knowledgeable regarding the various projects contained in the 2002 Stipulation. (*Id.*, p. 26)

Notwithstanding the above-referenced testimony, plaintiffs focus on the 2004 overflows and their new perspective on what is needed to obtain compliance. The record established that these rains after 2002 were highly unusual and in excess of the five-year design standard. SEWRPC, the state organization responsible for tracking precipitation events in the area, determined that the 20-day rainfall in May of 2004 had a recurrence interval somewhere between 10 and 200 years. (8/25/05 Tr., pp. 356-357; Ex. 46, Table 4)

17

Case 2:02-cv-00270-CNC   Filed 12/14/07   Page 17 of 19   Document 123

However, MMSD's modeling suggests that the SSOs would have been prevented by the improvements required by the Stipulation. In any event, the subsequent events are being prosecuted by the DOJ.

Plaintiffs have gone to great lengths to include in this record the current enforcement actions by the DOJ. As stated by the Seventh Circuit, "[i]f any additional operational or management problems have become evident since the 2002 Stipulation, the State and MMSD are entitled by the Act to an opportunity to resolve them before the plaintiffs may jump into the fray." (*Friends of Milwaukee's Rivers and Lake Michigan Federation*, 382 F. 3d at 762). In addition, the Seven Circuit has observed that:

> 'Simple justice' is achieved when a complex body of law developed over a period of years is evenhandedly applied. The doctrine of res judicata serves vital public interests beyond any individual judge's ad hoc determination of the equities in a particular case. There is simply 'no principle of law or equity which sanctions the rejection by a federal court of the salutary principle of res judicata.' *Heiser v. Woodruff*, 327 U.S. 726, 733, 66 S. Ct. 853, 856, 90 L. Ed. 970 (1946).

*Supporters to Oppose Pollution, Inc. v. The Heritage Group*, 973 F.2d 1320, 1326 (7th Cir. 1992). Recently, the Wisconsin Supreme Court wrote that it's "clear that an ad hoc exception to the doctrine of claim preclusion cannot be justified simply by concluding that it is too harsh to deny an apparently valid claim by balancing the values of claim preclusion against the desire for a correct outcome in a particular case." *Kruckenberg*, 279 Wis. 2d at 544.

Regardless of any individual's determination of the equities in this case, the policies of finality and repose prevail. There is no dispute that a sewerage overflow of any measure is undesirable. Yet, the defendant cannot be held to a compliance standard above and beyond its CWA and WPDES permit. Moreover, this court's analysis begins with the

18

assumption that the State has acted diligently. *Friends of Milwaukee's Rivers and Lake Michigan Federation*, 382 F.3d at 760 ("We recognize that diligence on the part of the State is presumed."). The Seventh Circuit has explained this presumption is a result of the intended role of the State as the primary enforcer of the Clean Water Act, and "that courts are not in the business of designing, constructing or maintaining sewage treatment systems." *Id.* (citations omitted).

Thus, as instructed, this court has not taken the statements of the state and MMSD at face value in examining whether their 2002 Stipulation is "capable of requiring compliance with the Act and is in good faith calculated to do so." *Id.* Consequently, based on this record, including technical information and weather data available to the parties, this court finds that the WDNR prepared the subject 2002 Stipulation to achieve compliance. That effort substantiates diligent prosecution.

Now, therefore,

IT IS ORDERED that MMSD's motion to dismiss is granted as plaintiffs' case is barred by the doctrine of res judicata.

IT IS FURTHER ORDERED that this case is dismissed.

Dated at Milwaukee, Wisconsin, this 14th day of December, 2007.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. DISTRICT JUDGE